UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SHELDON LATIMER,

      Plaintiff                         Civil Action No. 03-73343

v.                               HON.  JOHN CORBETT O'MEARA
                                       U.S. District Judge
                                       HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL            U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Sheldon Latimer brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 (Tr. 25-27).  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  I recommend that Defendant's Motion for Summary Judgment be DENIED, and Plaintiff's Motion for Summary Judgment GRANTED, remanding this case for further administrative proceedings.

## PROCEDURAL HISTORY

On April 25, 2001, Plaintiff filed an application for SSI and DIB, alleging an onset of disability on February 5, 2001 (Tr. 25-27). After denial of his initial claim, Plaintiff filed a timely request for an administrative hearing, held on May 20, 2003 in Detroit, Michigan before Administrative Law Judge (ALJ) William A. Wenzel. Plaintiff, represented by attorney Andrew Mullet, testified (Tr. 254-270). Samuel R. Goldstein, Vocational Expert (VE) also testified (Tr. 270-276). ALJ Wenzel found that although Plaintiff was unable to perform any of his past work, he retained the capacity to perform a limited range of unskilled, light work (Tr. 13). Plaintiff filed for judicial review of the final decision on September 18, 2003.

## BACKGROUND FACTS

Plaintiff, born November 4, 1950, was age 52 when the ALJ issued his decision on July 24, 2003 (Tr. 14, 25). He graduated from high school and received college credits (Tr. 13). He worked previously as a crew leader at a restaurant chain (Tr. 13, footnote 7). Plaintiff alleges an onset date of February 5, 2001 due to hand problems (Tr. 33).[1]

### A.      Plaintiff's Testimony

On May 20, 2003, Plaintiff testified before ALJ Wenzel that he currently worked at a fast-food restaurant as a salad maker (Tr. 254). He reported earning approximately $300.00

---

[1]Plaintiff's application states that he experienced "mental dystonia" (Tr. 233). Later, on his application for a hearing, Plaintiff stated that he also experienced depression, alcoholism, and hypertension (Tr. 60).

a month, estimating that he worked 20 to 23 hours a week (Tr. 254). In response to the ALJ's question, he indicated his employer gave him the option to work a greater number of hours (Tr. 254). Plaintiff then modified his answer by stating that a recent request to work more hours had been denied by his boss (Tr. 255). He testified that he had also unsuccessfully sought employment elsewhere (Tr. 255).

Plaintiff reported that he had seen a hand specialist approximately six times up until early 2001 when his insurance was discontinued (Tr. 256). He indicated that he had experienced body tremors after an inappropriate dosage of Artane (Tr. 256). Despite his lack of insurance, Plaintiff indicated that he saw a primary care physician every month, adding that he had also undergone psychiatric counseling (Tr. (Tr. 257- 258). He reported that his psychiatrist prescribed both Wellbutrin for depression and Zyprexa to treat his hand problems (Tr. 258). He stated that taking Zyprexa helped prevent his hands from "locking up" (Tr. 258). He opined that his hand problems had been triggered by his former job as a pot washer at a hotel (Tr. 259).

Plaintiff testified that after experiencing alcohol problems in 2001, he entered a treatment program and had been alcohol free since (Tr. 259). He stated that he had first received Wellbutrin during his two month detoxification program, adding that he continued to use Wellbutrin and Zyprexa to the present (Tr. 259). He indicated that he generally took Artane for his hands on work days only (Tr. 261-262). In response to his attorney's questioning, he reported that hand problems had obliged him to leave work early approximately three times in the past year, and forced him to turn down additional shifts

-3-

twice (Tr. 262). He testified further that he had first received a diagnosis of depression in 2000 (Tr. 263). He reported that his depression created fears that others were "after him," which prevented him from leaving home (Tr. 263). He reported further that approximately two weeks before the hearing, people in his neighborhood attempted to knock him to the ground and rob him (Tr 264). He added that the two individuals who had assaulted him had walkie-talkies with them (Tr. 264). He stated that he did not call the police (Tr. 265). He indicated that he slept during the day, adding that he was confident that no one would "mess with" his mother's house during the daytime (Tr. 265).

In response to further questioning by the ALJ, Plaintiff stated that he had also worked previously as a mail clerk on the campus of Wayne State University (Tr. 267). He reported that his job duties required him to lift up to fifty pounds occasionally (Tr. 268). He stated that in his former job as a crew leader at McDonald's he lifted a maximum of 20 pounds (Tr. 268-269). He stated further that from 1985 to 1992 he worked as a customer service clerk in a department store, which required him to stand most of the day and lift a television "every now and then" (Tr 269).

### B.    Medical Evidence

#### 1. Physical Impairments

In July, 2000, Plaintiff sought treatment for joint locking and spasms in his hands (Tr. 64). Mehul M. Mehta, M.D., injected Plaintiff's left hand with cortisone (Tr. 64). Dr. Mehta speculated at Plaintiff's next appointment that he might experience tendinitis, adding that he suspected "symptom magnification" as well as "social problems" preventing him

from working (Tr. 65).  A radiology report the same month showed "mild flexion at the fifth

PIP joint," but otherwise unremarkable results of the left hand study and "some incurving at

the right fifth PIP joint with flexion at the fifth PIP joint" in the right hand study (Tr. 130-

131).

In August, 2000, Plaintiff again sought treatment for hand problems (Tr. 66).  C.

Morton, M.D., prescribed occupational therapy three times a week for three to four weeks,

along with Anaprox (Tr. 67-68).  Dr. Morton noted at a followup appointment later the same

month that Plaintiff's hand locking problem had not been documented by either himself or

Plaintiff's physical therapist (Tr. 72).  She deemed Plaintiff capable of returning to work

without restrictions (Tr. 77).  An EMG performed at the end of the month showed results

"consistent with median neuropathy" of the left wrist, but "no evidence of other focal

neuropathy or cervical radiculopathy bilaterally" (Tr. 86).  Emily Smith, M.D., examined

Plaintiff in  September, 2000, noting that his "x-rays and diagnostic workup was essentially

negative," which raised the question of "malingering" (Tr. 132).  An examination performed

by Dr. Smith in October, 2000 indicated that Plaintiff continued to complain of wrist pain

and locking after several hours of pot scrubbing at work (Tr. 115).  Plaintiff admitted using

alcohol approximately three times a day (Tr. 115).  Dr. Smith concluded that Plaintiff

suffered from "a form of 'writer's cramp'" which was caused by repetitive movements (Tr.

116).  In November, 2000 Edwin B. George, M.D., Ph.D., examined Plaintiff, noting that

although Plaintiff presented symptoms consistent with segmental dystonia, he did not appear

to experience "a true task specific dystonia" (Tr. 119).  He noted further that an MRI of the

brain showed "diffuse atrophy, consistent with his chronic alcohol use" (Tr. 119).   In December, 2000 Dr. George suggested that Plaintiff's dystonia might show improvement if he were to work in four hour shifts (Tr. 123).   Dr. Smith examined Plaintiff the same month, noting that he did not complain of hand cramping or spasms since receiving a prescription for Artane (Tr. 136).   Later, Plaintiff's dosage was reduced after he experienced severe diffuse body shakes (Tr. 136).   He was placed on medical leave until the first week of January, 2001 (Tr. 136).

A Physical Residual Functional Capacity Assessment performed in August, 2001 found that Plaintiff retained the ability to lift twenty pounds occasionally and ten pounds frequently, as well as the ability to stand, walk or sit for six hours in an eight hour workday (Tr. 161).   The report found that Plaintiff retained only a limited ability to push and pull in the upper extremities due to recurring spasms (Tr. 161).   The report found that Plaintiff's work abilities were otherwise unlimited, noting that he had been suspected of malingering (Tr. 162).

### 2.  Mental Impairments

In May, 2001 P. Baddigam, M.D., conducted a mental health evaluation on behalf of the Social Security Administration (SSA) (Tr. 142).   Dr. Baddigam noted that Plaintiff denied any physical or emotional problems, but laughed unpredictably and inappropriately during the course of the examination (Tr. 142).   Dr. Baddigam rated his hygiene as "not that clean," observing that he "came with a big bag," noting further that Plaintiff, 50, reported that he was attending Wayne State University and planned on going into teaching (Tr. 143).

-6-

Plaintiff denied hallucinations, delusions, and homicidal or suicidal ideations (Tr. 144). Dr. Baddigam found that Plaintiff experienced segmental dystonia and hypertension, but gave him a good prognosis psychiatrically (Tr. 145). He assigned Plaintiff a GAF of 80[2] (Tr. 145). A Psychiatric Review Technique performed the next month found that Plaintiff did not experience a medically determinable impairment (Tr. 146).

In November, 2001, Therapist Bethany Bell interviewed Plaintiff, noting that he experienced symptoms of anxiety, depression, and paranoia (Tr. 218). Plaintiff reported a family history of alcoholism, indicating also that he had been the victim of rape ten years before (Tr. 218). In December, 2001 Psychiatrist V. Lingam, M.D., who continued to treat Plaintiff over the next year and a half, performed a psychiatric evaluation, noting that he had been evicted from his home earlier in the year (Tr. 199, 203, 233, 258). According to Dr. Lingam's notes, after seeking shelter at a rescue mission, he had been admitted to Quality Behavioral Health for detox, then transferred to Sobriety House (Tr. 233). Plaintiff told Dr. Lingam that he had been living in a "3/4 house" since September (Tr. 233). Plaintiff admitted that before entering detox he had drunk approximately a fifth of Vodka each day (Tr. 233). He expressed the belief that he was being stalked at his current residence by the

---

[2]GAF rating of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)* 34 (4th ed.2000).

house manager and others (Tr. 233). During a mental status examination performed at the same time, Plaintiff garbled the spelling of simple works and demonstrated a poor ability to calculate (Tr. 234). Dr. Lingam deemed Plaintiff's intelligence in the average range, but noted that he exhibited psychotic and depressive disorders, assigning him a GAF of 40/50 (Tr. 234).[3]

In January, 2002 Psychologist Karen I. Young, Ph.D., administered a series of mental and psychological tests, reporting that Plaintiff demonstrated moderately to severely impaired academic skills and a Full Scale IQ score of 76, placing him in the 5th percentile of intellectual functioning (Tr. 236). Dr. Young diagnosed Plaintiff with major depression, and anxiety, recommending that Plaintiff "continue outpatient therapy in a supportive environment" (Tr. 239-240). A psychiatric evaluation performed by Lisa Fuller, D.O., sometime between September, 2001 and March, 2002 noted that Plaintiff had a history of polysubstance abuse, alcohol, cannabis, sleeping pills, and barbiturates (Tr. 168). Plaintiff reported that he completed an Associate's degree and had work experience as a crew shift leader, jewelry store customer service representative, and mail clerk (Tr. 169). He indicated that his alcohol abuse interfered with his job (Tr. 169). Dr. Fuller described Plaintiff's mood as "[a]nxious and sad" (Tr. 169). Notes indicate that Plaintiff admitted to a history of past

---

[3]A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication ... or major impairment in several areas, such as work, school, family relations, judgment, thinking or mood." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ), 34 (4th ed.2000). A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Id.*

suicidal thoughts but did not act on them (Tr. 170).  Dr. Fuller assigned him a GAF 45 (Tr. 170).

Discharge notes created by New Center Community Mental Health Services in April, 2002 rate Plaintiff's condition as "fairly stable" and a "good" prognosis with continued treatment (Tr. 211).  Plaintiff was referred to New Center's Adult Services clinic for further care (Tr. 211).

### C.    Vocational Expert Testimony

VE Samuel Goldstein classified Plaintiff's past  relevant  work dishwashing and pot washing as unskilled at the medium level of exertion; mail-sorting as unskilled at the light to medium level of exertion; salad-making as semi-skilled at the light level of exertion; and work as a crew leader at McDonald's as unskilled at the the light to medium level of exertion (Tr. 271).  He added that the salad making work could also be performed at the medium level of exertion (Tr. 271).  The ALJ then found that Plaintiff was not performing his current job as a salad maker enough hours a week to qualify as substantial gainful activity, eliminating it from consideration as past relevant work (Tr. 271).

After determining that the VE's testimony was consistent with the Dictionary of Occupational Titles (DOT) the ALJ posed the following question:

> "[W]e want you to consider an individual who is closely approaching advanced age during the period at issue, has had 14 years of formal education, and has past relevant work as classified by you, the same skill level and exertional levels as you classified for [Plaintiff] in this case.  He's had a combination of impairments, including a condition involving his hands bilaterally that has been described as idiopathic dystonia or idiopathic segmental dystonia, which is – dystonia being disconnective movements due

to disordered tenacity of the muscles. And it was the opinion of one examiner, a hand specialist, that this dystonia was not task specific. He has corrected visual acuity of 2,200 and 20/40 in another eye, secondary to exotropia. He has a history of alcohol dependence and abuse, having been in a 60–day, inpatient rehabilitation program for alcoholism in 2001. He was found on a brain scan to have some cerebral and cerebella atrophy second to his chronic use of alcohol. And he has been treated for depression and high blood pressure. With medications that have been given for the dystonia, including Artane and Zyprexa, which have been noted to – and admitted at the hearing, have been noted to improve or to lessen the severity of [his] hand conditions. There's no evidence to the contrary and we'll assume for this hypothetical that his depression is fairly well controlled by his Wellbutrin. The individual has performed work as a ballpark concession stand worker from March 2002 through October of 2002. And while it was not substantial gainful activity and while it ended due to the end of the baseball season, it's some indication of a capacity for work. He is presently working as a 20 hours a week fast-food salad maker and has considered and applied for working more hours than 20 hours a week, but his employer has not accommodated his request at the present time. I want you further to assume that he has the functional – maximum functional capacity for work as follows: he can lift and carry up to 20 pounds maximum and occasionally and 10 pounds frequently; there are no limitations to his ability to sit, stand and walk; he's able to use his upper extremities for gross handling frequently during an eight-hour workday, but not constantly. Given the medications that he's taking and the fact that he is being treated for depressive disorder, we'll assume that there might be some moderate limitation in his ability to understand, remember and carry out detailed and complex job instructions. And finally, we'll assume that because his medications control, but does eliminate, the problem of dystonia, we'll assume that he will miss up to one day of work a month due to hand symptoms. Dr. Goldstein, do you have an opinion about whether the individual that I've described would be capable of performing any of his past, relevant work?"

(Tr. 272-274). The VE found that given the above limitations on hand movements, Plaintiff could not perform any of his past relevant work (Tr. 274). He determined that Plaintiff could nonetheless perform a number of jobs existing in the regional economy including the work of a visual inspector (6,000 jobs), entry-level security worker (3,500

-10-

jobs), and office cleaner (8,000) (Tr. 274-275).    The VE found that consideration of

Plaintiff's reduced visual acuity in one eye would not reduce the inspection job numbers for

the reason that the position required only "gross inspecting," for "very obvious defects" (Tr.

275).  In response to questioning by Plaintiff's attorney, the VE testified that if the same

individual were also required to miss a total of three days of work per month due to hand

problems or depression, all gainful employment would be precluded (Tr. 275-276).

###    D.    The ALJ's Decision

On July 24, 2003, ALJ Wenzel found Plaintiff experienced a severe impairment

which did not meet or equal any listing included in Appendix 1 to Subpart P, Regulations No.

4 (Tr. 13).[4]  The ALJ held that Plaintiff's  impairments were considered severe based on the

requirements of 20 C.F.R. § 404.1521, but found nonetheless that they did not meet or

medically equal one of the impairments found in Part 404 Appendix 1 Subpart P, Regulations

No. 4 (Tr. 13).

The ALJ found that while Plaintiff was unable to perform his past work, he retained

the residual functional capacity (RFC) to perform the exertional and non-exertional

requirements of work except for:

> "lifting more than 20 pounds occasionally or more than 10 pounds frequently,
> 'constant' handling, and understanding and carrying out detailed or complex
> tasks"

(Tr. 14).  The ALJ concluded that Plaintiff could perform a limited range of light work

---

[4]As discussed, *infra*, at no point in the decision did the ALJ actually state which Step
Two impairments he believed Plaintiff experienced.

including jobs as a visual inspector (6,000 jobs), office clerk (8,000), and security worker (3,500).

ALJ Wenzel found Plaintiff's allegations of limitations "not credible," citing one physician who was "unable to 'find anything structural or objectively wrong with him,'" and another care provider who refused to write work restrictions (Tr. 12, 13). Despite his allegations of limitations caused by his hand problems, the ALJ noted Plaintiff continued to dress, groom himself, and drive (Tr. 10).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of

-12-

whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### Full and Fair Hearing

Plaintiff's counsel argues that his client did not convey the extent of his history of mental illness until just before the May 20, 2003 administrative hearing, thus preventing counsel from submitting pertinent mental health records until after the hearing. *Plaintiff's*

-13-

*Brief* at 3.  Citing *Washington v. Chater,* 1996, U.S. Dist. LEXIS 15600 (E.D. Mich., 1996), he maintains that the ALJ failed to develop a sufficient administrative record, arguing further that the RFC created by the ALJ failed to take into consideration his "paranoia and low IQ" *Id.* at 11-13.  In addition to the arguments that the administrative process was insufficient, he argues that the ALJ erroneously concluded from his April, 2002 discharge from New Center Community Mental Health Services that he no longer required psychological care. *Id.* at 14.

As noted by Plaintiff, the administrative decision contains a number of obvious defects and omissions.  Whether or not  the ALJ's failure to adopt the findings that Plaintiff suffered from paranoia and a low IQ, standing alone,  requires a remand, a number of errors, assessed cumulatively, mandates a remand for clarification and further fact finding.

 First, as noted in section D., *supra,* the ALJ's decision does not contain a finding at Step Two of the administrative process.  At the beginning of the ALJ's discussion he states that Plaintiff's "condition produces limitations that meet [the Step Two] definition of 'severe' as will be clear from the discussion of the claimant's residual function capacity [RFC] later in this decision" (Tr. 9).  However, the RFC composed by the ALJ does not state which impairments he finds severe, only referring to "medically determinable impairments" (Tr. 11).  In addition, the "Findings" section of the decision, found at the end of the opinion does not provide illumination.  Finding  3, for example, states that Plaintiff's impairment significantly limits his ability to perform basic work activities, but again, does not state which impairment (Tr. 13).  Further, while earlier portions of the opinion refer to

-14-

"impairments," Findings  3 and 4 refer to only to a single "impairment" (Tr. 9, 11, 13).

Omission of an explicit finding of Step Two impairments does not in and of itself require remand.   *Street v. Barnhart* 340 F.Supp.2d 1289 (2004), 1293 -1294 (M.D.Ala.,2004);   *Moran v. Commissioner of Social Security* 2003 WL 22002432, 2 (E.D.Mich.,2003); *Leeper v. Sullivan* 1990 WL 77874, 2 (N.D.Ill.1990).  In the present case, however, unlike those cited above, the ALJ's failure to state his Step Two findings creates problems with his analysis at Steps Four and Five.

While the Court can infer from the ALJ's analysis through Step Five of the sequence, along with ALJ's discussion of Plaintiff's hand treatment, that he experienced the severe impairment of dystonia, the same assumption cannot be made with respect to the omission of Step Two findings  regarding a number of Plaintiff's mental health problems.  Plaintiff testified at the hearing that he continued to take depression medication (Tr. 259).  Although Drs. Lingam and Young, along with Therapist Bell, found that Plaintiff suffered from paranoia and a psychotic condition along with depression,  the ALJ apparently adopted the uncorroborated opinion of Dr. Baddigam, a consultive physician, who "gave no psychiatric diagnosis and gave a a GAF rating of 80"[5] (Tr. 10, 144-145).

Next, even if it were to be inferred that the ALJ did not find a severe mental

---

[5]Dr. Baddigam's May, 2001 mental health evaluation (Tr. 142-146) is itself somewhat puzzling.   He noted that Plaintiff laughed inappropriately throughout the exam, exhibited poor hygiene, wore an overcoat to his late May appointment, and carried a big bag (Tr. 143).  Yet, Dr. Baddigam did not appear to discern that Plaintiff was homeless - a fact confirmed by his care providers after he entered a detox program later the same year  (Tr. 143).

impairment at Step Two, this implicit finding is problematic in that it appears to be based on an erroneous interpretation of the record. The ALJ, conceding in footnotes 4 and 5 that Plaintiff may have experienced severely limited functioning reflected by his stay at a detox facility and subsequent admittance into a 3/4 house for substance abusers, found that "it is unnecessary to explore this question further because of durational considerations" (Tr. 10-11, footnotes 4 and 5).   The ALJ states that he bases the  assumption that Plaintiff was well by April, 2002 on the fact that his treatment at  New Center Community Mental Health Services had been "successfully concluded" (Tr. 12 *citing* 210-211).  However, Plaintiff's termination report, which states that his condition was "fairly stable" at the time, conditions its prognosis on Plaintiff's *continued treatment,* referring him to New Center's Adult Services for further care consistent with his condition (Tr. 211).[6]  Moreover, the same termination report concludes that at the time of discharge, Plaintiff continued to experience not only depression and alcoholism, but a psychotic disorder and problems related to his social environment (Tr. 210).

The ALJ's failure to acknowledge Plaintiff's *ongoing* mental health problems at Step Two, including a psychotic condition and social problems, cannot be construed as harmless

---

[6]The ALJ's  "durational" findings, which presumably found that Plaintiff only experienced severe mental problems between September, 2001 and March, 2002, also failed to consider evidence suggesting that his mental and/or psychological impairments started much earlier than September, 2001.  In August, 2000, Dr. Morton reported that Plaintiff smelled strongly of alcohol at his 9:30 a.m. appointment (Tr. 80).  An assessment performed in October, 2000 stated that Plaintiff, suffering from depression, "need[ed] a drink in the morning," and reported blackouts (Tr. 112-113).

error.[7]   The ALJ's failure to consider or discuss these limitations tainted the rest of the five-step process,[8] including the ALJ's ultimate finding that Plaintiff retained the capacity to perform the jobs of visual inspector, office clerk, and security monitor (Tr. 13). [9]

_____

   [7]There is substantial evidentiary confirmation of Plaintiff's mental problems, including treating sources.  In this regard, the ALJ failed to note that one of Plaintiff's care givers, treating physician Dr. Lingam, found that he suffered from psychotic disorders (Tr. 234). *See Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004)(If an ALJ declines to give controlling weight to the opinion of a treating source, he must nonetheless assess various factors, such as the nature and extent of the treating relationship in assessing weight.) *See also, Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (footnote 7) (6th Cir. 1991) ("[I]t is well-settled in this circuit that treating physicians' opinions, based on objective evidence, should be accorded significant weight.  If uncontradicted, the physicians' opinions are entitled to complete deference.") Although the ALJ apparently skirted this requirement by stating that Plaintiff's mental problems did not meet the twelve month durational requirement, as stated above the ALJ's durational findings in regard to Plaintiff's mental health are based on an erroneous reading of the record.

   [8]Sixth Circuit case law requires that a hypothetical question must accurately reflect an individual's limitations.  *See Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir. 1997)(A hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments.) More recently, in *Webb v. Commissioner of Social Sec.* 368 F.3d 629 (6th Cir. 2004), the court rejected the proposition that an ALJ is required to list all of a claimant's maladies verbatim in the hypothetical question. Nonetheless, the *Webb* court acknowledged that "[t]he hypothetical question . . . should include an accurate portrayal of [a claimant's] individual physical and mental impairments." (internal citations omitted) *Id.* at 632, *quoting Varley, supra,* 820 F.2d at 779.   *See also Smith v. Halter,* 307 F.3d 377, 379 (6th Cir. 2001).
     While in any case, pursuant to *Webb,* the ALJ was not required include explicit references to Plaintiff's psychosis in his hypothetical limitations, a question does remain as to whether the ALJ's hypothetical would or should have included limitations (such as limited contact with the public) consistent with a psychotic condition, if he had performed a proper analysis of the treating physician's opinion.  Footnote 7, *supra, citing* Tr. 234.

   [9]The administrative opinion contains the finding that Plaintiff can perform the work of an "office clerk" (Tr. 13).  However, office clerk work, which requires proofreading, as well as sorting and filing records according to DOT CODE: 209.562-010, generally falls into the semi-skilled category. *See Mittag v. Barnhart*, 365 F.Supp.2d 809, 815 (S.D.Tex.,2004) *See also, Culbertson v. Barnhart* 214 F.Supp.2d 788, 793 (N.D.Ohio,2002). The ALJ's job

-17-

Finally, although Plaintiff's primary argument that he did not receive a full and fair hearing, in and of itself appears to be a weaker argument for remand, when placed in the context of the ALJ's overall treatment of Plaintiff's mental health records it strengthens an already strong case for remand. During the hearing, Plaintiff's attorney, attempting to illustrate his client's paranoia and psychotic disorders, asked him to relate an alleged incident in which he believed that neighbors were monitoring his behavior with walkie-talkies (Tr. 264). The ALJ interrupted counsel's examination, stating that he did not deem it relevant, then quoted the May, 2001 mental health evaluation which found no paranoid ideation, and had assigned Plaintiff a GAF of 80 (see footnote 6) (Tr. 265-267). The absence of additional medical records at the hearing which reflected severe mental and emotional impairments appears to have impeded the ALJ from fully developing the record. In particular, as noted in footnote 8, the ALJ did not have the benefit of the treating source mental health diagnoses when he composed his hypothetical at the hearing. Although an ALJ cannot properly assume the role of counsel, "[h]e acts as an examiner charged with developing the facts." *Lashley v. Secretary of Health and Human Services* 708 F.2d 1048, 1051 (C.A.Tenn.,1983); *Richardson v. Perales,* 402 U.S. 389, 411 91 S.Ct. 1420, 1432, 28 L.Ed.2d 842 (1971). The hearing transcript demonstrates that the absence of additional mental health records from treating sources, admitted the week after the hearing, appears to have prevented the ALJ from developing a full record.

---

determination stands at odds with his finding that Plaintiff could perform only unskilled work (Tr. 13).

-18-

An ALJ  "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Lowery v. Commissioner, Social Sec. Administration,* 55 Fed.Appx. 333,  339,  WL 236419, 5 (6th Cir. 2003)  (*quoting Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir.1995))  Remanding a case in which the ALJ's decision included unsupported conclusions, the court in *Alexander v. Barnhart*, 74 Fed. Appx. 23, 27, 2003 WL 22087496, 4 (10th Cir. 2003) found that the ALJ had not "perform[ed] the required analysis. . . . [I]n determining that plaintiff's statements were not supported by the record, he again misstates that very record." In *Hardman v. Barnhart,* 362 F.3d 676,  679 -680 ( 10th Cir. 2004), the court stated,  "In the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion.

In the present case, the ALJ's opinion is an enigma.  While he found unspecified severe impairments at Step Two, he did not follow through on his promise that the nature of those impairments would "become clear" in his RFC analysis.  To the contrary, it is most unclear from this record whether the ALJ rejected Plaintiff's well-documented psychotic and paranoid disorders as severe impairments, or whether he simply failed to consider them.  If he indeed rejected them, he failed to state adequate reasons for doing so, given that they were based on the reports of a treating physician.  The ALJ's reference to durational requirements was itself grounded in a selective reading of the record.

In short, the ALJ has not provided a basis for this Court to follow his "path of reasoning," and thus to assess whether his decision to deny benefits was supported by

substantial evidence. While this record does not justify a remand for an award of benefits, *see Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994)[10], it does require a remand for reconsideration and clarification.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment be GRANTED, remanding the case for further fact-finding and clarification.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

---

[10]*Faucher* holds that it is appropriate to remand for an award of benefits when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


S/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  January 9, 2006

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 9, 2006.


S/Gina Wilson
Judicial Assistant